Filed 1/28/22  P. v. Welton CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROBERT JOHN WELTON,<br><br>        Defendant and Appellant. | A159136<br><br>(Solano County<br>Super. Ct. No. VCR231394) |

Defendant and appellant Robert John Welton (appellant) appeals following his convictions on numerous charges arising from three incidents. We affirm.[1]

PROCEDURAL BACKGROUND

In February 2018, a nine-count indictment was filed in Solano County Superior Court charging appellant with offenses arising out of three incidents in early 2017.

---

[1] In a separate petition for writ of habeas corpus, case No. A163718, appellant has raised a number of claims challenging the competency of his trial counsel.  We have denied that petition by separate order filed this date.

Count one charged appellant with the February 25, 2017 murder of Michael Knight[2] (Pen. Code, § 187),[3] with enhancements.

Count two charged appellant with the February 26, 2017 murder of Julian Hawkins (§ 187), with enhancements and special allegations. Counts three and four charged appellant with the attempted murders (§§ 187, subd. (a), 664) of Mark S. and Adam J., on the same date, with enhancements. Counts five and six charged appellant with assault with a firearm (§ 245, subd. (a)(2)) upon Mark S. and Adam J., on the same date, with enhancements.

Count seven charged appellant with the attempted murder (§§ 187, subd. (a), 664) of Jelani P. on March 1, 2017, with enhancements. Count eight charged appellant with shooting from a motor vehicle (§ 26100, subd. (c)) at Jelani P., on the same date, with enhancements. Count nine charged appellant with assault with a firearm (§ 245, subd. (a)(2)) upon Jelani P., with enhancements.

In September 2019, a jury found appellant guilty on all the charges with the exception of count seven, as to which it was unable to render a verdict. The jury also found true the various enhancement allegations, found that the murder charged in count one was in the second degree, and found that the murder charged in count two was in the first degree. The trial court declared a mistrial as to count seven and subsequently granted the prosecution's motion to dismiss that count.

In November 2019, the trial court sentenced appellant to an aggregate term of 169 years to life.

---

[2] The indictment identified the victims by initials only, but the victims' names are clear from the evidence at trial.

[3] All undesignated statutory references are to the Penal Code.

2

FACTUAL BACKGROUND

February 25, 2017 Stabbing of Michael Knight

On the evening of February 24, 2017, appellant and his girlfriend, Calee H., visited a high school friend, Leah L., at her home. Leah L. had been in a serious car accident that left her paralyzed and required the use of a wheelchair. She lived with roommates in a three-bedroom house on Western Avenue in Vallejo. Many different people stayed at the house for short periods, and the house was frequented by methamphetamine users.

In late February 2017, Leah L., Sunshine A., and Ray F. were staying in the bedrooms at the house; Michael Knight had been staying in Ray F.'s room for a couple weeks; and Puna S. was staying in the garage, which had been converted for that use. Michele R. was a handyman who often did work on the house, including in late February. A friend of Ray F.'s named Neal K. was also at Leah L.'s house on February 24.[4]

The stabbing of Knight happened in the morning on the next day, February 25, 2017. Appellant testified he went to Leah L.'s house at about 10:00 a.m. that day. Michele R. testified he was playing video games with Sunshine A. in her bedroom that morning when he heard an argument coming from the bedroom next door. One of the people involved in the argument was Knight, who had slept in there the night before. The second voice was a man's voice that Michele R. did not recognize. Michele R. heard the man tell Knight to get out of the room. Michele R. heard the two men move from the bedroom to the backyard. Michele R. told the police that he

---

[4] Leah L., Sunshine A., Puna S., Michele R., and Neal K. all testified at trial; Ray F. did not testify. The testimony is summarized herein, except for the testimony of Leah L. and Sunshine A., which included nothing significant on any material issue.

thought Knight was arguing with appellant, but at trial Michele R. said he did not know because he never actually saw who Knight was arguing with.

Michele R. testified that, after hearing the argument move to the backyard, he went to check on Leah L. and then to the front door. When he opened the front door he saw Knight approach the door bleeding and asking for help. Michele R. saw appellant "off to the side … headed out toward the front." Appellant did not look as if he had just been in a fight; he looked "just as surprised as everyone else." Michele R. suggested that appellant drive Knight to the hospital because Michele R.'s car was full of stuff. In response, appellant "started walking toward [his] car" as if to drive Knight; Knight started to move towards appellant's car but then turned and went to Michele R.'s car, saying something about driving himself. Michele R. drove Knight to the hospital. Michele R. asked Knight who stabbed him, but Knight did not answer. Knight died at the hospital.

Puna S. testified that, on the morning of February 25, 2017, she woke to find appellant and Ray F.'s friend Neal K. in her room, which was the converted garage. She went to the house to talk to Ray F., who was her cousin, and then Knight followed her back to the garage. Knight asked appellant if there was a problem between them, and then appellant followed Knight back into the house. Subsequently, Knight ran back into the garage. Knight said appellant had a knife and asked her for a weapon. Then appellant came into the garage with a knife in his hand. Appellant was yelling at Knight; Knight was scared and asking appellant to let him leave. Puna S. testified that when Knight turned to walk out appellant "stabbed him right in the neck and then walked off like nothing happened." Knight and appellant exited the garage and walked toward the front of the house. Puna S. also went to the front of the house. Appellant was trying to get

4

Knight into his car and she heard Knight say "No, you just stabbed me." Puna S., Ray F., and Neal K. left before the police arrived; Puna S. went to the police station that evening.[5]

Puna S. further testified that, days after the stabbing, appellant returned to Leah L.'s house. She was in the kitchen cooking and appellant banged on the back door and said "open the fucking door." Another man, subsequently identified as Aaron G.,[6] was with him. When Puna S. returned to the garage after appellant left, she discovered that "the garage door was pried up bent up and my room was tossed."

Neal K. testified he had breakfast with Puna S. and Ray F. in the garage on February 25, 2017.[7] He heard yelling and saw appellant fighting with Knight, who was trying to get away from appellant. They entered the garage and Neal K., Puna S., and Ray F. exited the garage, leaving only appellant and Knight inside. Next, Knight came out of the garage holding his bleeding neck. He said, "This mother fucker stabbed me." Neal K. understood him to mean appellant, with whom he had been fighting. Appellant followed Knight out of the garage, acting like nothing had happened.[8]

Appellant testified he went to Leah L.'s house on February 25, 2017 to bring her some clean bedding because the night before he noticed her bedding

---

[5] Puna S. acknowledged she had convictions for receiving stolen property in 2013 and for identity theft in 2014.

[6] Appellant testified he went back to Leah L.'s house to drop off a TV and Aaron G. was with him.

[7] Neal K.'s account differed from Puna S.'s account in this respect, as she testified she woke up to find appellant and Neal K. in her room.

[8] Neal K. admitted he was a methamphetamine addict at the time of the stabbing, but he did not recall using the drug the day of the stabbing or the day before.

was soiled. He heard bickering in the distance but stayed only briefly and exited through the front door and proceeded to his car parked across the street. As he reached his car he heard screaming and saw a man he did not know standing near the front door bleeding from his neck. Appellant approached the man to help, getting close enough to touch the man's hand, but the man got into another car and was driven away. Appellant then went home.

Knight died of blood loss from the stab wound in his neck.

As explained later in this factual summary, when appellant was arrested he was wearing blood-stained shoes; Knight's blood was on the right shoe.[9]

February 26, 2017 Shooting at Gentleman Jim's Bar

In the early morning hours on February 26, 2017, less than a day after the Knight stabbing, Julian Hawkins, Mark S., and Adam J. were shot in the bathroom of a bar called Gentleman Jim's in Vallejo.

February 25, 2017 was the birthday of appellant's girlfriend, Calee H. At around 10:00 p.m. that evening, appellant, Calee H., and her sister went to Gentleman Jim's. It was a Saturday night; the bar was crowded and a DJ was playing loud music. Calee H. and her sister danced on a pole in the middle of the dance floor, drawing the attention of many bar patrons.

One of the victims, Adam J., testified he met friends at Gentlemen Jim's on the night of February 25, 2017. He and Calee H. had slept together in the past. At some point that evening, Adam J. went into the bathroom. One of the other victims, Hawkins, entered the bathroom in front of him, and

---

[9] On appeal, appellant argues the jury could have inferred he had Knight's blood on his shoe because he got close to Knight when he offered to drive Knight to the hospital.

6

the third victim, Mark S., was washing his hands. Appellant was in the bathroom as well.[10] Adam J. had never met him before, but they greeted each other with a fist bump. Then appellant, without warning, shot Mark S. in the face and shot Hawkins in the back of the head. Appellant then turned and pointed the gun at Adam J.'s head; Adam J. pushed appellant and ran out of the restroom. Appellant shot at Adam J. four times, hitting him in the shoulder and arm. Adam J. ran and hid behind the bar.

Mark S. testified he did not see who shot him. He recalled hearing a "bang" while he was at the bathroom sink and woke up on the floor next to Hawkins. The bullet entered near his right ear and chipped his jaw bone.

Hawkins died at the scene from a gunshot wound to his head.

Barry J., who worked security for Gentleman Jim's, testified he recalled that appellant and two women arrived at the bar around 10:00 p.m. on February 25, 2017. Appellant left at around 11:30 p.m. and returned with a pit bull at around "last call," which was at 1:00 a.m. Barry J. told appellant he could not bring the dog into the bar but then became distracted by a drunk patron. He then noticed the dog tied up outside and went into the bar to look for appellant. Barry J. then heard six gunshots, saw one man run out of the bathroom, and then saw appellant come out with his hoodie up.[11] Barry J. lost sight of appellant in the chaos after the shooting. When Barry J. made it back outside after helping to deal with the commotion inside, he noticed the dog was gone.

---

[10] Adam J. did not identify appellant when he was first shown a photo lineup. At trial, he testified he recognized appellant in that lineup, but he was "scared" to identify appellant. He identified appellant in a second photo lineup months later.

[11] Barry J. did not identify appellant in a first photo lineup, but he identified him in a second photo lineup in which appellant's neck tattoos were visible.

7

Another witness, Virgil N., testified he saw a man come out of the bathroom after the shooting, walk out the front door, retrieve a tan pit bull that had been left outside, and walk away. He was unable to say whether appellant was the man he saw.[12]

A surveillance video from a pizza restaurant next to Gentleman Jim's depicted a man wearing a hooded sweatshirt walking with a pit bull toward the bar at 12:59 a.m. and walking away from the bar about five minutes later in the direction of appellant's home. Appellant's roommates testified he owned a white and tan pit bull. In her recorded police interrogation that was played for the jury, Calee H. said her house was only a 15-minute walk from the bar, and she identified the dog in a still from the video as her and appellant's dog.

As explained later in this factual summary, when appellant was arrested he was wearing blood-stained shoes; Mark S.'s blood was on the left shoe.[13]

Appellant and Calee H. both testified that during the evening on February 25, 2017, a group went out for dinner to celebrate Calee H.'s birthday and then they and Calee H.'s sister went to Gentleman Jim's,

---

[12] Other witnesses described events in the bar in the chaos that followed the shooting, but it is unnecessary for purposes of the present decision to summarize that other evidence.

[13] In his testimony, appellant tried to explain the evidence of Mark S.'s blood on his shoe by claiming that earlier on the day of the shootings he left his shoes at the home of a friend, Trevor Dupper, and that the friend subsequently confided in him (appellant) that he (Dupper) was the shooter at Gentleman Jim's. Appellant was wearing the blood-stained shoes when arrested on March 3, 2107; he explained he had retrieved them from Dupper's house. Appellant said he did not tell the police about Dupper's confession because he did not want to "snitch" on Dupper, but, because Dupper was deceased at the time of trial, appellant was willing to reveal the information.

arriving between 9:00 and 10:00 p.m. Appellant testified he left after about an hour and went home, and he was home at the time of the shootings.[14]

March 1, 2017 Shooting in Vehicular Dispute and Appellant's Arrest

In 2017, Jelani P. lived on Franklin Street in Vallejo, fairly close to appellant's home. On March 1, Jelani P. was driving home from work when he encountered appellant driving toward him in a white car. At that point, Jelani P. was on Franklin Street, only two houses away from his home. A woman, later identified as Calee H., was in the passenger seat. Jelani P. testified that Franklin Street is narrow, so he pulled over to let appellant pass. Instead, appellant's car stopped alongside Jelani P.'s car, and "[w]ords were exchanged." According to Jelani P., appellant asked whether Jelani P. knew who he was and asked if Jelani P. "wanted some problems." Appellant's car was blocking Jelani P. from continuing home; after "about 30 seconds going back and forth," Jelani P. got out of his car and asked appellant to move his car. Jelani P. testified he did not threaten appellant and did not have a weapon. When Jelani P. was about a foot away from the driver's window of appellant's car, appellant shot him, striking him on the right side.[15] Jelani P. walked a short distance and then fell on the ground; appellant drove away.

---

[14] Two of appellant's roommates testified appellant came home at about 10:00 p.m. the evening of February 25, 2017. That testimony was inconsistent with the evidence of appellant's presence at the bar at that time. But the roommates' testimony was not inconsistent with the evidence appellant was the shooter at the bar at about 1:00 a.m., because both roommates testified they were asleep before midnight.

[15] Jelani P. testified he heard one gun shot, but he suffered two injuries from bullet fragments, in addition to the injury from a bullet that entered and left his body. A criminalist testified that it is possible for a single shot to ricochet and inflict more than one injury.

Appellant testified that in the March 1, 2017 incident, Jelani P. had stopped his car blocking the street and appellant's car could not get through. Appellant was "trying to inch through" and Jelani P. was "hollering, 'Get out of the way, you fucking asshole', or something to that manner." The cars stopped and then appellant was surprised to see Jelani P. near his window; Jelani P. was yelling and he had what "looked like a tire iron, in his hand." In response, appellant testified he grabbed his firearm "and I pointed it down outside the window and I fired once [at the ground] to scare him off." Jelani P. then "turned and walked off like as if nothing had happened." "He didn't say anything."

Calee H. testified that Jelani P. hopped out of his car "screaming … 'Do you know me,' " and walked towards their car "with something long and sharp in his hands … it looked like a tire iron." Jelani P. then grabbed the driver's side window (which was down) while yelling " 'Do you know me' " and waving his hands. Appellant then shot his firearm at the ground and Jelani P. said something like " 'All right. I got you' " and walked off. Jelani P. "walked normally over to his car and got in his car." Appellant and Calee H. then drove off.

On March 3, 2017, Jelani P. saw the same white car drive by his house, so he called the police and provided a partial license plate. That afternoon, a police officer spotted appellant in a white car and arrested him. Appellant's shoes had red stains on them. It was later determined that Knight's blood was on the right shoe and Mark S.'s blood was on the left.

DISCUSSION

I. *Any Error In Denying Severance Was Harmless*

Appellant contends the trial court abused its discretion in denying appellant's requests for severance of the trials of the charges arising from

10

each of the three incidents underlying the indictment.  In denying severance, the trial court reasoned that the three incidents involved offenses of the same class and that it would be more efficient to have one trial.  Any error was harmless.

"Section 954 provides that 'two or more different offenses' may be charged in the same pleading if the offenses are either 'connected together in their commission' or 'of the same class.'  This 'statute permits the joinder of different offenses, even though they do not relate to the same transaction or event, if there is a common element of substantial importance in their commission, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 455 (*Armstrong*).)  Appellant concedes the "same class" requirement was met in the present case.  (See *People v. Thomas* (2012) 53 Cal.4th 771, 798 (*Thomas*).)  However, even when the requirements for joinder under section 954 are satisfied, a trial court "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately." (§ 954; see also *Thomas*, at p. 798.)  "In ruling on a severance motion, 'the court must assess the likelihood that a jury not otherwise convinced beyond a reasonable doubt of the defendant's guilt of one or more of the charged offenses might permit the knowledge of the defendant's other criminal activity to tip the balance and convict him.' " (*Armstrong*, at p. 455.)  " '[T]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*Ibid.*)

"In reviewing a trial court's denial of a motion for severance, 'we consider the record before the trial court when it made its ruling.' [Citation.]

We first consider whether evidence of each of the offenses would be cross-admissible in 'hypothetical separate trials.' [Citation.] If the evidence is not cross-admissible, we then consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citation.] In making this assessment, 'we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.] We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.' " (*Armstrong, supra*, 1 Cal.5th at p. 456.)

In the present case, appellant argues the evidence was not cross-admissible because the three incidents were wholly unrelated. Further, appellant argues the shootings at Gentleman Jim's were "particularly inflammatory" and the evidence of appellant's guilt in the other two cases was much weaker than the evidence in the bar shootings. On the other hand, respondent argues "the evidence supporting all the charges would have been cross-admissible in separate trials to prove motive, intent, state of mind, and identity." Respondent also argues the benefits of joinder outweighed the potential for prejudice to appellant.

12

We need not determine whether the trial court abused its discretion in denying severance, because appellant has not "demonstrate[d] a reasonable probability that the joinder affected the jury's verdicts." (*People v. Grant* (2003) 113 Cal.App.4th 579, 588; see also *People v. Merriman* (2014) 60 Cal.4th 1, 49 (*Merriman*).)[16] Notably, we disagree with appellant's assertion that the evidence supporting the charges arising out of the Gentleman Jim's incident was substantially stronger than the evidence supporting the charges arising out of the other two incidents. Of course, appellant is correct the evidence of his guilt in the bar shootings was very strong. Among other things, victim Adam J. identified him as the shooter; victim Mark S.'s blood was on one of appellant's shoes; the bar's bouncer testified appellant arrived with his dog shortly before the shooting and emerged from the bathroom after the shooting; another witness testified a man left the bathroom after the shooting and retrieved a dog tied out front; and a video showed a man arriving with appellant's dog shortly before the shooting and leaving shortly thereafter. Further, appellant's defense evidence was weak: appellant's roommates failed to provide a solid alibi for appellant given the proximity of his home to the bar, and appellant's explanation that his friend Dupper borrowed his shoes and committed the shootings strained credulity to say the least.

Nevertheless, the evidence against appellant in the other cases was nearly as strong. As to the stabbing incident, both Puna S. and Neal K.

---

[16] The courts articulated that "reasonable probability" standard in the context of determining whether a proper denial of severance nevertheless deprived a defendant of due process based on the evidence actually admitted at trial. (See *Merriman*, *supra*, 60 Cal.4th at p. 49.) Appellant does not, however, argue that a different standard of review applies where the reviewing court assumes the trial court erred in denying severance.

testified appellant and Knight were arguing; Puna S. testified she saw appellant stab Knight; and Neal K. testified only appellant and Knight were in the garage at the time of the stabbing and that Knight said appellant stabbed him. Furthermore, Puna S. testified that appellant returned to the house with a friend a few days later, in an intimidating incident that a reasonable trier of fact could have inferred strongly reflected appellant's consciousness of guilt. Moreover, despite appellant's suggestion to the contrary, none of the other testimony was inconsistent with Puna S. and Neal K.'s narrative: other witnesses testified they did not see the stabbing or who was arguing, but their descriptions of the incident were not inconsistent with appellant stabbing Knight and then proceeding to his car across the street. Finally, while it was *possible* Knight's blood fell on appellant's shoe when he offered Knight a ride, there was little likelihood the jury would accept that explanation given the other evidence of appellant's guilt. Accordingly, there is no reasonable likelihood the verdict on the stabbing charge would have been different if it had been tried separately from the charges arising out of the other two incidents.

We reach the same conclusion as to the assault on Jelani P. Had the jury convicted appellant of attempted murder, appellant might have had a good argument for prejudice, due to the lack of direct evidence of appellant's intent to kill. But the jury failed to reach a verdict on that charge and convicted appellant only of assault. All three witnesses testified appellant shot in Jelani P.'s direction (at the ground, according to appellant and Calee H.) from a foot away, and appellant does not argue there was any possibility the jury would harbor doubt that action constituted an assault. (See *People v. Williams* (2001) 26 Cal.4th 779, 788 ["a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a

14

battery would directly, naturally and probably result from his conduct"].) Instead, appellant argues the jury might have found the assault was in self-defense had the charges been tried separately. But appellant fails to explain how the shooting was in self-defense, even accepting appellant and Calee H.'s account of the incident. Although they testified Jelani P. was angry and holding what appeared to be a tire iron, neither testified that Jelani P. made any verbal threats or wielded the tire iron in a threatening manner, and appellant did not testify he believed Jelani P. was about to strike him. Appellant cites no authority an individual may act in self-defense merely because the individual is in the presence of an angry person holding a potential weapon. (See *People v. Brady* (2018) 22 Cal.App.5th 1008, 1014 [" 'To justify an act of self-defense for [an assault charge under … section 245], the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him.' "] (italics omitted).)[17]

Furthermore, it is not reasonably likely the outcome would have been more favorable to appellant had the cases been severed for the additional reason that inconsistencies in appellant and Calee H.'s narratives strongly suggested they were lying. For example, Calee H. testified Jelani P. was saying "do you know who I am," grabbed the window, and said "All right. I got you" after the shooting. Appellant, on the other hand, testified Jelani P. appeared at his window without warning, did not testify Jelani P. grabbed the window, and expressly testified Jelani P. walked away without saying anything. Additionally, appellant and Calee H.'s testimony that Jelani P. walked away normally after being shot lacked credibility. Accordingly, even

---

[17] In any event, any such argument has been forfeited due to appellant's failure to articulate his reasoning and support it with citations to pertinent authorities. (*Los Angeles Unified Sch. Dist. v. Torres Constr. Corp.* (2020) 57 Cal.App.5th 480, 497–498.)

15

assuming the events as described by appellant and Calee H. were legally sufficient to undermine the assault charge, it is not reasonably likely the jury would have accepted appellant and Calee H.'s account of the incident in a separate trial.

Because "[a]ll of the crimes were proved by strong, direct evidence, which included testimony either by eyewitnesses or the victims themselves" (*Merriman, supra*, 60 Cal.4th at p. 47), appellant has not shown he was prejudiced by any error as to severance.[18]

II.    *Appellant's Claim Regarding the Sleeping Juror Was Forfeited*

In the middle of the second day of trial testimony, juror number seven informed the trial court that she has "a hard time staying awake." The court acknowledged it had seen another juror nudge her the day before and asked how many times the juror had fallen asleep. The juror reported that another juror told her she had been falling asleep "everyday." Juror number seven said she had missed "some" of the testimony the day before; she did not know how much but she thought "not too much." The trial court offered the attorneys an opportunity to ask any questions and defense counsel asked "Does she feel that she can go on or?" The juror responded, "I would like to try, that's why I'm here now." The trial court stated, "Let's keep going. This

---

[18] We recognize the prosecutor argued in his closing argument that the evidence in all the incidents was "all … part of a pattern" that showed motive, state of mind, intent, and identity, among other similar arguments. The prosecutor's arguments, even if improper, do not alter our conclusion, given the strength of the evidence against appellant on each of the counts on which he was convicted. Further, because any error in denying severance was harmless, joinder necessarily did not result "in 'gross unfairness' amounting to a denial of defendant's constitutional right to fair trial or due process of law." (*Merriman, supra*, 60 Cal.4th at p. 46.)

is why we have alternates. . . . let's see how we go and if you think it's a recurring problem, let me know, we can always revisit this later."

On appeal, appellant contends the trial court erred in failing to discharge juror number seven on the basis that she was unable to perform her duties as a juror. (§ 1089; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 350 ["The trial court has the authority to discharge jurors for good cause, including sleeping during trial."].) However, defense counsel did not request that the trial court discharge the juror, and counsel did not object to the trial court's decision to leave her on the jury, with the option of revisiting the issue later. Neither does appellant point to any portion of the record where defense counsel, before the end of trial, expressed concerns that juror number seven continued to sleep or requested that she be discharged. Given appellant's failure to request discharge of juror number seven during trial, any error in retaining the juror has been forfeited and may not be asserted as a basis for reversal on appeal. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 59 ["Defendant also forfeited his claim of error arising from the trial court's failure to discharge the juror. Defendant neither sought the juror's excusal nor objected to the trial court's handling of the issue."]; see also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1170.)

Appellant does not dispute his claim is subject to forfeiture, but he argues the issue was not forfeited because any request to discharge the juror would have been futile in light of the trial court's ruling. However, even assuming an immediate request for discharge would have been futile, the trial court expressly stated its willingness to "revisit" the issue, pointing out that alternate jurors were available. Therefore, there is no basis to conclude a request to discharge the juror before the end of trial would have been futile, either on the ground that she slept during portions of the first two days of

trial testimony or that she continued to fall asleep at other points during the trial.

In the alternative, appellant contends his attorney's failure to request removal of juror number seven constituted ineffective assistance of counsel (IAC). "To establish [IAC], a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301 (*Sepulveda*).) However, " 'On direct appeal, if the record " 'sheds no light on why counsel acted or failed to act in the manner challenged,' " we must reject the claim " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " ' [Citations.] Accordingly, 'except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of [IAC] should be raised on habeas corpus, not on direct appeal.' " (*Ibid.*)

Appellant argues, "There could have been no tactical reason for failing to object once the juror's inability to perform her duties was discovered." We disagree. Counsel may have thought juror number seven was a more favorable juror for appellant than the alternate jurors, or that it was to appellant's advantage that the juror slept during portions of the prosecution's case in chief. We reject appellant's IAC claim on appeal.

III.  *Appellant's Remaining Claims Are Without Merit*

A.    *Jail Phone Calls*

Defense counsel objected to the admission of portions of six jail phone calls, three between appellant and his mother and three between appellant

and Calee H. Appellant contends the trial court abused its discretion in admitting the calls because they were "irrelevant and highly prejudicial." He has not shown prejudicial error.[19]

" ' " 'Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence.' " ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.)

First, appellant challenges admission of an excerpt of a phone call from appellant to his mother on August 11, 2019, during trial. Appellant told his mother that he was trying to contact Aaron G., who accompanied him to Leah L.'s house a few days after the Knight stabbing, as described in eyewitness Puna S.'s testimony. Appellant's mother replied, "Well there's a real reputable person." Appellant responded, "Well, he might not be that reputable, but I tell you what, he'll make an appearance, and you know what I mean?" Appellant also said "He'll help" and commented that he wanted Aaron G. to sit with his mother. Appellant's mother said that someone named Larissa was going to sit with her, but appellant wanted Aaron G. because "these other individuals know who his face is." Later in the call, appellant complained about the unfairness of the denial of severance and made the following additional comments: "So I'm at a point where I gotta do what I gotta do;" "People need to just . . . stop lying and look the other way;"

_____

[19] Appellant also argues the prosecutor took portions of the jail calls out of context. We address that claim below in Part III.C.

19

"People just need to, you know what I mean. Look man, know what I mean? You ain't gaining nothing out of this. You need to just go the other way;" and "The way that they're playing this with us, we're gonna have to go above and beyond. . . . We're gonna have to sink to their level." Contrary to appellant's argument on appeal, the excerpt from the August 11 call was clearly admissible as evidence from which the jury could reasonably infer appellant sought to intimidate witnesses at trial, which the jury could further infer reflected appellant's consciousness of guilt. (*People v. Moore* (1945) 70 Cal.App.2d 158, 163 ["Any conduct of a defendant subsequent to the commission of the offense with which he is charged that indicates a consciousness of guilt is relevant and admissible against him."].)

Next, appellant challenges admission of brief excerpts of phone calls from appellant to his mother on August 14 and 16, 2019. In the August 14 call, appellant told his mother he sent her a letter and stated, "there are some things in there that are for just me and you, some insurance you have, just a little information, OK." He continued, "Ok, so we're not gonna say nothing to either [the defense counsel or defense investigator].[20] Ok? Um, it's just a little personal insurance since, since what has happened I knew was gonna happen. So this, this is why I went this way. And took this route." In the August 16 call, appellant's mother acknowledged receipt of the mail from appellant and stated, "So I guess I can stop taking notes now," to which appellant responded, "Oh, taking tabs on everything and everyone?" Appellant's mother also stated "Good job honey," and appellant responded, "I'm always looking for a little bit of insurance." The prosecutor argued the letter referenced in the calls contained information that could be used to

---

[20] Appellant referred to "Mike or David," who respondent identifies as the defense counsel and investigator. Appellant does not suggest otherwise.

20

coerce or intimidate witnesses, and the fact that appellant hid the information from his attorney and investigator showed there was something nefarious about it. Appellant, on the other hand, characterizes the exchange as "cryptic" and argues it is "unfounded conjecture" that appellant sought to intimidate witnesses. The trial court did not abuse its discretion in admitting the excerpts of the August 14 and 16 calls. Even though it is not clear what appellant meant by "insurance," the jury could reasonably infer the calls reflected an attempt to improve his prospects at trial by improper means, which the jury could further infer reflected a consciousness of guilt. Appellant's inability to credibly explain what he meant by "insurance" in his testimony further strengthened that inference. (Evid. Code, § 413.)

Appellant also contends the trial court abused its discretion in admitting a portion of a phone call from appellant to Calee H. on August 11, 2019. In the call, appellant mentioned Ray—who may have been Ray F., who was present at the Knight stabbing. Appellant appeared to make reference to wanting Ray to "[j]ust go the other way man," which respondent suggests meant he wanted Ray not to testify. At the end of the excerpt, appellant declared, "I would hate to get fucked over because of some fucking weak ass motherfuckers like this." We conclude the trial court abused its discretion in admitting the excerpt of that call. Appellant's comments about "Ray" are almost incoherent, and his statement about not wanting to "get fucked over" is one a guilty or innocent person could make. In any event, even though the court erred, the error was harmless because it is not reasonably probable the jury's verdict was influenced by appellant's comments, which suggested no nefarious conduct on his part with respect to the witnesses.

Finally, appellant contends the trial court abused its discretion in admitting excerpts of two phone calls from appellant to Calee H. on April 14,

21

2018. In the first excerpt, appellant and Calee H. argued and she told him, "You're the one fucking did this." That statement was relevant to impeach her testimony that appellant was innocent. In response to that statement, appellant denied doing anything and then said, "I'm not the one that laid your ass down and slid a dick in you." That expression of jealousy was relevant to support the prosecution's theory that appellant committed the Gentleman Jim's shooting because he was jealous after seeing other bar patrons watch Calee H. dancing. In the excerpt, appellant and Calee H. continued to argue and appellant eventually threatened, "You know what bitch, if I was there I would knock your teeth down your throat and you know it." The trial court abused its discretion in admitting that portion of the call, because appellant's threat was not relevant to any issue at trial. Respondent speculates that expression of anger was due to Calee H. violating an agreement that she not have sex with others, but that speculation is insufficient to support admissibility. In any event, there is no reasonable probability that admission of the portion of the excerpt containing that threat affected the jury's verdict.

In the other excerpt of an April 14, 2018 call between appellant and Calee H., they discuss appellant's friend Trevor Dupper, who appellant testified confessed to the Gentleman Jim's shooting. Appellant's comments included the following: "This is the only way;" "If he was alive I couldn't say nothing;" "I'm just saying if he was still alive, I wouldn't, I couldn't talk about this because it would be like I would be telling on him;" and "Cause if we have a chance, this is it." He also said, "I'm not saying he did anything. I love him to death. And I wanna cry right now . . . . But the thing is, is why lose both of us, if we can prevent it in some way . . . . [H]e's made it to where, there's a better chance, there's a better option now . . . ." With respect to the

22

Gentleman Jim's incident, Calee H. said, "I don't know how Trevor has anything to do with it," and appellant responded, "I don't either." That call excerpt was clearly admissible to support a reasonable inference that appellant's testimony about Dupper's confession was false.

Appellant has not shown prejudicial error in admission of excerpts from the jail phone calls.[21]

B. *Trevor Dupper Letter*

At trial, the prosecutor offered into evidence one page from a letter that appellant had apparently written to his friend Trevor Dupper. The page was numbered three and mailed in May 2017, a couple months after appellant's arrest in the present case; Dupper's father testified he found no other pages. In the letter, appellant expressed a great deal of hostility towards Dupper. Appellant accused Dupper of "helping them foolz kill me" and told Dupper to "die [choking] on a dirty pipe." Appellant also referred to injuring someone who attacked him in jail, stating "day 1 they came at me in fact I fucked that fool there still diggin sum of his tooth out of my elbow."[22]

---

[21] Although appellant's primary argument is that the excerpts should have been excluded as irrelevant, he also argues in the alternative that they should have been excluded under Evidence Code section 352 because the prejudicial impact far outweighed the probative value. Appellant has not shown the trial court abused its discretion. As the previous discussion makes clear, the excerpts presented little risk of *undue* prejudice. (See *People v. Valdez* (2012) 55 Cal.4th 82, 145.) Notably, appellant's theory of prejudice assumes none of the excerpts were relevant to show witness intimidation, falsification of Trevor Dupper's confession, or jealousy, but we have concluded to the contrary. We also reject appellant's assertion that the trial court failed to weigh the probative and prejudicial value of the excerpts.

[22] Appellant argues that portion of the letter should have been excluded because it presented appellant as violent. He cites to nowhere in the record where he requested redaction of that portion of the letter. Even assuming the claim has not been forfeited and assuming the court erred in not redacting that portion of the letter, there is no likelihood appellant's statement that he

On appeal, appellant argues the trial court abused its discretion in admitting the letter because it was irrelevant. The prosecutor argued the letter impeached appellant's characterization of Dupper as a close friend who he would never "snitch" on. In response, appellant argues, "The letter might have been a glimpse into a rift between the two friends at one moment in time. Harsh words and angry accusations between friends can have many explanations and many resolutions. Other pages of the letter might have explained why appellant was angry at [Dupper]."

The trial court did not abuse its discretion. Although appellant is correct the letter may have represented only a short-lived rift between appellant and Dupper, the jury could also reasonably infer from the intense tone of the letter that the two had had a break in their friendship that was inconsistent with appellant's characterization of their relationship at trial. Further, appellant points to no portion of his testimony where he explained the contents of the letter. (Evid. Code, § 413; see also *People v. Cortez* (2016) 63 Cal.4th 101, 117.)

C. *Prosecutorial Misconduct and IAC*

Appellant presents several claims of prosecutorial misconduct and related IAC claims.

Appellant argues the jail call excerpts were taken out of context and the prosecutor committed misconduct "in redacting the calls in an unfair manner" and in arguing "unfair inferences" based on the calls. That claim

---

exercised self-defense in jail affected the verdict in light of the totality of evidence in the case. We also note that, in another portion of the letter, appellant told Dupper, "U fools [wanted] a monster/ no you help created a 'Beast' you [turned a] killa into a fucking psychopath." Appellant asserts no claim as to admission of that language on appeal, and any such claim has been forfeited.

has been forfeited because appellant cites to no portion of the record where appellant requested admission of additional portions of the calls to provide context or objected to the excerpts on the ground of prosecutorial misconduct. (*People v. Brown* (2003) 31 Cal.4th 518, 553.)  In any event, appellant has not shown the greater context of the calls changes the meaning of the portions admitted into evidence.  Finally, appellant has not shown his counsel's failure to seek admission of additional portions of the call or to object on the ground of prosecutorial misconduct was IAC, both because counsel could have had a tactical reason for not doing so and because appellant has not shown prejudice.  (*Sepulveda, supra*, 47 Cal.App.5th at p. 301.)

Appellant argues portions of the prosecutor's closing during which he called appellant a liar constituted misconduct.  But that claim has been forfeited because appellant cites to no portion of the record where counsel objected on that ground.  And appellant has not shown the failure to object was IAC because counsel could have had a tactical reason for not objecting and because appellant has not shown prejudice.

Finally, appellant contends the prosecutor committed misconduct "in engineering a bogus reason to have members of appellant's support network excluded from the courtroom during trial," referring to the exclusion of Aaron G. and appellant's mother.  The claim has been forfeited because appellant cites to no objection in the record below.  In any event, appellant has not shown it was error to exclude Aaron G., identified by the prosecution as a potential witness, in light of Puna S.'s testimony.  (See *People v. Valdez* (1986) 177 Cal.App.3d 680, 687.)  Neither has appellant shown it was error to exclude appellant's mother after the prosecution identified her as a potential witness due to the jail calls.  (*Ibid.*)

D.      *Cumulative Error*

Appellant argues, "even if this court deems that none of the individual errors were prejudicial alone, the cumulative effect of these multiple errors requires reversal."  (See *In re Reno* (2012) 55 Cal.4th 428, 483.)  Most significantly, we have assumed for purposes of our analysis that the trial court erred in rejecting appellant's request for severance.  We have also assumed the court erred in failing to redact appellant's account of striking another inmate in self-defense in his letter to Dupper (if the claim is not forfeited), and we have concluded the court erred in admitting one jail call excerpt (incoherently referring to Ray F.) and one sentence in another excerpt (referring to knocking Calee H.'s teeth down her throat).  The latter errors related to the jail calls and the letter to Dupper add little additional prejudice to cumulate.  Given the overwhelming evidence of appellant's culpability in the underlying cases, appellant has not shown he was prejudiced by cumulative error.  (See *People v. Cain* (1995) 10 Cal.4th 1, 82 ["Defendant was entitled to a fair trial, not a perfect one."].)

DISPOSITION

The trial court's judgment is affirmed.

_____
SIMONS, J.

We concur.

_____
JACKSON, P. J.

_____
NEEDHAM, J.

(A159136)